Good morning, Your Honors, and may it please the Court, my name is Michael Tenor. I'm an attorney with Neumiller and Beardsley. I'm here with my colleague Cliff Stevens. We represent the Chapter 7 bankruptcy trustee in this case, Gary Farrar, who was also the successful plaintiff in the adversary proceeding below. He comes to you as the appellant this morning after reversal by the Ninth Circuit Bankruptcy Appellate Panel, and we respectfully ask this Court to reverse the Bankruptcy Appellate Panel for three reasons. First, Your Honor, there was sufficient evidence for the trial court to conclude, to plausibly conclude, as it did, that the Warda Ignanato firm was an insider of the debtor, Bella Vista. Second, there was also sufficient evidence for the trial court to plausibly conclude, as it did, that Warda Ignanato was an insider of the debtor, Bella Vista. Third, and finally, Your Honors, we ask that you Can you just quickly repeat the first two? I got lost. What was the first point? The first point was that Warda Ignanato, there was evidence that Warda Ignanato was an insider of Bella Vista. Okay. And what's the second? The second is that Warda Ignanato was the initial transferee. I apologize. Oh, okay. I believe I said insider. It was the initial transferee of the $100,000 from Bella Vista to Warda Ignanato. Okay. And what's the third? And the third, Your Honors, is that if the Court should decide to affirm on the basis of the insider issue, this Court should we would ask that the Court limit the affirmance only to the about $23,000 issue. Okay. Let's Can we just jump right to that one? Absolutely, Your Honor. Okay. So let's say that we disagree with you on the insider status. Did, I mean, the Bankruptcy Court's determination seems a little ambiguous. On the one hand, you could read him as saying, is it, I'm sorry, is it a him or her? I can't remember. Judge Chardas, him. Yes, Your Honor. It's impossible on this record to figure out what portion of the money of the $100,000 was a, help me out with the terminology, a fraudulent transfer versus a preferential transfer versus a fraudulent transfer. Or you could just read him as saying, look, I'm not going to waste my time trying to figure out what portion, because under my ruling, it doesn't matter. Well, I think the latter is correct, Your Honor. I can't jump into the judge's mind, but I can certainly point to the Court that there was adamant testimony by Mr. Warder that he was clear that the amount of money that Bella Vista owed was, the exact number, Your Honor, is $23,182. And where did that come from? Where did that figure come from? It's so precise, none of a penny. Well, it comes, at first, it's in a, Plaintiff's Exhibit 2 in the trial court. There's a letter from Mr. Warder to our firm, to the Neumuller and Beardsley firm, in which he says that the amount that Bella Vista owed was this $23,000 figure. And then counsel at trial asked Mr. Warder about this and asked him to confirm that this number was correct, and he said he said that he was certain that that number was accurate. So why did the bankruptcy, I don't understand why the bankruptcy court then said, I can't figure this out. And, Your Honor, I'm sorry, I don't have a better answer for you. I don't know why that's true, either. But the evidence is there that the court could have done that. And certainly, this Court is able to sustain the, is able to affirm the trial court and reverse the bankruptcy court on any theory, including on any evidence of the record. Are you asking us just to send it back, basically, for a redetermination, or are you asking us just to resolve this ourselves? Well, Your Honor, certainly I think that if we could send it back, that would be fine. I think that the court could confirm from the record. Certainly, I think that the evidence is there for this Court as well. Either way, Your Honor, I think that that would be a preferable result to affirming a decision that's clearly not supported by the record. And, Your Honor, as you know, as this Court knows, this Court reviews the bankruptcy panel's decision in Novo, but applies a clearly erroneous standard of review to the findings. Under the clearly erroneous standard of review, those findings must be affirmed by a reviewing court unless the court, unless there's no plausible reading of the evidence that would support that conclusion. You know what, you mentioned the initial transferee issue. That's the other thing I wanted to ask you about. So what's the problem there? I'm having a hard time figuring out why there's an issue about whether the law firm was, in fact, an initial transferee. We don't think there is an issue, absolutely, Your Honor. The bankruptcy court clearly found that it was Bella Vista's money. It was a check made out to Bella Vista. It was sent to Bella Vista based on a settlement agreement that required the payor of the check to indemnify a judgment against Bella Vista and not against any other entity. So this was Bella Vista's money. And this money was transferred directly from Bella Vista to the law firm. We don't believe there is an issue. Robertson, But there's some issue when they, when the law firm first gets the check, right? It's not clear what's going to happen to the money? Well, Your Honor, what Mr. Warta testified is that he was instructed by his client to, by John Williams, who's the individual that is sort of in charge of both the Bella Vista debtor and the various other affiliated entities, that he says, pay Bella Vista and then, pay Bella Vista's outstanding bills and then pay these other entities' outstanding bills. Because the Warta and Yonato firm was representing all of these entities collectively, Mr. Williams himself and John C. Williams' company, JCW Cypress, and the debtor Bella Vista, all of these collectively. So he says, well, I owe you $100,000 or more, take this check, apply it to Bella Vista and then pay the rest. And so what the trial court found, correctly found, was as to Bella Vista, because Warta and Yonato was an insider, the look-back period is a year. And so this was a preferential transfer as to the Bella Vista's debt, which was, again, $23,000. With respect to the remaining amount, the trial court found, well, Bella Vista didn't owe that. I'm sorry. Well, Bella Vista didn't own or didn't owe the remaining $77,000. And so that amount that Bella Vista paid on behalf of other entities was a fraudulent conveyance in the sense that Bella Vista didn't receive any value in exchange for this transfer. Roberts, I understand that. But is there some issue as to, let's say, the $77,000, right, that Bella Vista was being paid for these other entities' debts? We certainly don't think so, Your Honor. We think that the $77,000, the critical fact is that that $77,000 was not paid on behalf of Bella Vista for previous debt. No, no. I know. But just as far as the initial transferee issue, is there some do we have to analyze that chunk of the money differently for purposes of 550? Your Honor, I don't believe so, because this is all Bella Vista's money, and it's all transferred to Warder and Unano. There's no evidence to support the conclusion that it went anywhere else. The bankruptcy court didn't find that it went anywhere else. The bankruptcy court found that this was Bella Vista's money. The judge specifically says this is Bella Vista's money that is transferred to Warder and Unano. So with respect to the other $77,000, there is an – I don't believe there is any issue with respect to initial transfer, Your Honor. So did the BAP disagree with you on this point as well? The BAP disagreed, although I think what the BAP's primary issue was, was because the judge didn't say specifically it's $77,000 versus $23,000 that's preferential versus fraudulent. The court, because the BAP determined that it wasn't preferential because Warder and Unano was not an insider, then it goes, well, and we don't have a specific finding as to which is which, and so we have to throw the whole thing out. And so what we point out to Your Honors, we believe the BAP erred, first of all, in determining that Warder and Unano was not an insider. But second of all, Your Honor, even if Warder and Unano was an insider, the BAP should have still affirmed the judgment at least in part for the $77,000 that was a fraudulent conveyance. Okay. Thank you. And, Your Honors, if I have – if there are no further questions, I'll go ahead and reserve the rest of my time for rebuttal. Thank you. Good morning, Your Honor. It's David Cook. May it please the Court. I'd like to address the issue of insider. And what the Bankruptcy Court did is essentially rule that anybody who is in Solvency Counsel is, as a matter of law, an insider. All Mr. Warder did was perform the services of General – I won't say General, Insolvency Counsel. And many debtors, before they file bankruptcy, as we all know, hire competent lawyers, advise them for a month or two months before, this is how insolvency works, this is how bankruptcy works, you know, these are things you can do, not do. This is just common. And in looking at what Mr. Warder did, again, giving the record as it is, he advised them, well, this is how you fill out schedules, or these are schedules, and this is timing, and all of this good stuff. There's nothing really exceptional about what Mr. Warder did in this case. Certainly, I would – by the way, coming here, I was going to say there's no Polaroid of Mr. Warder sitting at the – at the principal saying, do this, do this, and do that. Well, Polaroids are gone. Now it's Instagrams here, so to speak. But in any event, there's no such evidence here. So if – and reading – reading the submissions by the trustee, is we were unable to find any cases or a case cited saying somebody who's just traditional insolvency lawyers, debtor's lawyers, are, as a matter of law, an insider. To do so – to do so really, if you really kind of work through this thing, you're going to have to take a look at Bankruptcy Code Section 5 – pardon me, 101A31, which sort of lists all of these insiders. I mean, if Congress really wanted to say insolvency, you know, insolvency lawyer, debtor's lawyer is an insider, they could have written it in here and saying anybody who's a lawyer is an insider without being discourteous to Congress or anybody. It wouldn't have taken too much effort. Well, I'm – okay. I mean, I'll tell you, I'm inclined to agree with you on this point. But let me just ask you, the one thing that maybe would give one pause is that there just was something funny about the way the money was handled, right? Okay. Let's – and I – and in addressing that, that check comes in payable to the debtor. The check is endorsed, goes to Mr. Warda's trust account, not in dispute. And there's a – a period of time, you know, a frame here where Mr. Williams says to Mr. Warda, again, non-dispute, you can pay this, you can pay this, you can pay that, A through Z. We don't know, and it's not really critical. And Mr. Warda, being an attorney, follows those instructions. So if we don't But he does it in – in the way he pays his firm, though, is a little bit unorthodox, to say the least, right? Your Honor, I – you're – you're being courteous. About two steps ahead of me here. So if we stop the movie just at this, as we like to say, we stop the movie for that time frame, then we have to say, well, whose money is that, just – just from the moment that the – the money gets into that trust account to the moment it leaves, okay? And at that, like Fishta, like that frame, the money belongs to, not to Mr. Warda, but it really is under the control of Mr. Williams. Pay A, pay B, pay C, pay D. There's no claim that Mr. Warda was in control of those funds. There's certainly no accusation of that. So if we look at the word, the true concept of initial transferee, initial transferee is more than, as we say, a mere conduit, okay? It has to be somebody who says, that's my doe. You know, it's my money, and I have control of it. So giving, again, without conceding anything, everything, assuming all the facts as we see them here, is the money was, in fact, a transferee because they didn't have control during that timeframe. Now, I — Why does it matter? I don't understand why it matters during the timeframe. Eventually, all of the money gets paid to the law firm, right, for various debts. Well, for purposes of – for purposes of transferee and initial, sort of this waterfall which the code designates here, at that moment that Warda has those funds in a trust account, they're not his dollars. They're the dollars of a third party. And at that point, even though it's in a bank account under the name of Warda, it's not his funds. He's holding in a representative capacity. Right. Until Mr. Williams, is it, tells him, start paying these debts. That's correct. And therefore, he's not deemed a transferee because the concept of transferees has got to be – it has to be the lawyer's dollars, dollars the lawyer can save. But it is. It's money that he's owed for legal services that he's already rendered at that point. At the – he had a claim, well, without conceding too much, that he had to say, hey, I'm owed a bunch of money from a bunch of entities. But at the moment it was sitting there, he did not have the right to take those funds. And where the trustee goes askance – So who's the initial transferee, then? The initial transferee would be J.C. Williams. It would be Mr. Williams himself who has control over the funds. And that's why initial transferee focuses on the most important issue. He doesn't have any – that money belongs to the debtor. It's the – The check was made out to the debtor, right? It belonged – well, it belongs to the debtor, but it became – it became under the control of Mr. Williams individually, who said you can do this, you can do this, you can do that. He's just acting as the principal of the debtor at that point. Well, it could be. But at that point, Mr. Williams was not the transferee at that moment when it came to him because he didn't have control. It was not his funds. To call Mr. – call Mr. Ward the transferee would be to say, well, gee whiz, you're the transferee of these funds because it just comes in your trust account. What that would do is it would – He said if the Williams or Mr. Warder was the transferee. Excuse me, sir? The initial – who do you say the initial transferee is? Well, it's – here's a check payable to the debtor. It's endorsed, given by, obviously, Mr. Williams or somebody who had possession – you know, the paper comes to Mr. Warder, and he deposits in his trust account. And then he waits for directions from Mr. Williams to disperse the funds, and the funds are dispersed ultimately to Mr. – you know, for Warder's bills of some amount for work done for the debtor and some amount possibly not. Obviously, there's a complete failure in this record of how much, which destroys the fraudulent conveyance case. What about the $23,000 figure? That's Warder's – I don't think there's a doubt in the record as to the $23,000, but the $23,000 ultimately gets, for lack of a better expression, gets tossed on the insider issue here, and ultimately, just very, very succinctly here, if the Court disposes of the insider issue here, just presume that, then – and after spending some time thinking, everything else gets dumped because the trustee bears the affirmative burden of saying how much. Here, the – what the bankruptcy judge said, for lack of a better expression, is, it doesn't matter to me. It's one or the other. Phillips. But the BAP – I don't understand the BAP's decision to reverse outright as opposed to remanding after it reversed on the insider issue. It seems to me there is a way to figure out what portion should be allocated to the – allocated to the preferential transfer versus the fraudulent transfer. I'm coming here today, you know, that did whiz – that did whiz through my mind. But in looking at the Court's – I mean, the acid test here – Robertson. Well, I know what the bankruptcy judge said, and that's why I was questioning your opponent at the outset. But why don't you address his point that there is a figure down to the penny that Mr. Ward affirmed was, in fact, the amount that the debtor owed to his firm? There's no question there's an amount here, but there's nothing in this record here saying when and where and how, whether or not it came within the 90 days or beyond. And that's where the – Well, it all came within a year, right? If the Court tosses the year, then that gets tossed. Right. Okay. No, I'm – let's say that we agree with you on the insetter portion, okay? So the $23,000 is off the table. But I'm just saying as to the $77,000, why in the world wouldn't we send it back for the bankruptcy judge to make a determination as to whether all of the elements of a fraudulent transfer are made out as to that amount? Well, if we're resending it back, I mean, the – I mean, I'm just looking. I understand the Court read the findings back. So if I read it, I don't mean to suggest not. But I'm reading it at page 178. Because it's the same 100,000 is not fatally defective to the trustee's claim that today I cannot identify the specific dollar amount that represents the fraudulent conveyance part and the dollar amount that represents the preference. And then what the judge does is he lets the – the Williams entities off the hook because, quote, since I cannot determine what that amount is, the trustee is missing one element in his claim against these two entities. And he says that repeatedly. So, in effect, he – Right. But just why don't you address the point, though, that I understand what the bankruptcy judge said, but it sounds like he may well have been wrong on that specific point, because there's a precise dollar figure that we know represents the amount that – or don't we? That's what I'm asking, I guess. And this is a case where the – the – it would really – it would be a complete retrial, as the kids would say, a do-over. And the do-over here would be essentially a brand-new trial when the trustee did not  This is the trustee's claim. Mr. Warta is going to come in and give us a different figure the second go-round? Is that what you think is going to happen? I'm not sure that – that it's for Mr. Warta to do that. I think the trustee had powers of discovery. The trustee couldn't prove it. This is – these are legal bills. What more proof does he need besides Mr. Warta's testimony? I – apparently, from looking at this record, he failed to meet his burden of proof. Well, just – you're not – all I'm asking you is to explain how could the bankruptcy court have been under the impression that the – determining the exact amount was impossible on this record. I can only – that if the – Was there some dispute as to the amount at the trial? The testimony at trial was, is that nobody could tell. The testimony I had from Mr. Warta was, here's the precise figure down at the penny. And it was – there was no dispute. Either – either – the way it came out was, is there's nothing in this record here which said, aside from the 23, which is the remaining 77 grand here, that there was nothing that the trustee did and nothing that the court did to say, we're going to sort this out one way or another. The answer was that there was no way to tell. I mean, that would – you would be essentially asking for – for not new findings, for complete trial on this, when everybody had their – had their day in court, as we would like to say. That's – I mean, the judge was sitting there. He said, I can't tell. I know what he said. I read it. Okay. I don't think that's – without being discourteous to anybody, I don't think that's in dispute. He says it repeatedly. I don't know. Okay. Thank you, counsel. Thank you very much. I'm sorry. Thank you. Your Honors, I'd like to – I will address the – spend the balance of my time addressing the insider issue, but for just a moment, if I could take a brief aside. Your Honor, it asks with respect to the – where the number came from. In the letter from Ward and Yonano, Mr. – Mr. Warder writes that all of the $100,000 deposit was applied to outstanding fees for services, and none was released to JCW Cypress Home Group or any other J.C. Williams-related entity. Approximately $23,182.17 was used directly for Bella Vista invoices. The funds were depleted by about – by about March 21, 2007. And then at trial, Mr. Warder testifies – Is that letter in the excerpt somewhere? Yes, Your Honor. This is – it's page 200 – page 207 of the second volume of the excerpts. And then – He said approximately $27,000. He does – he does say – he does use the word approximately, but he's got it down to the penny. And I heard you say approximately. That's – that's his language in the letter. That's correct, Your Honor. And it was approximately $23,000-something, something, 113 cents? That's exactly – that's exactly what the letter says, yes, Your Honor. And then on – on page 58 of that volume, this is the transcript from the trial, Mr. Warder is asked, do you have any reason to doubt the information in that letter being correct? And he says, no, I'm certain that's what it is. And the question goes, and that amount being $23,182.17, correct? And he testifies that that's correct. So now – now, putting that issue aside for the moment, Your Honor, and addressing the – going back to the insider issue, Your Honor, the – the court, in looking at whether or not an individual is an insider, addresses two principal factors. One is whether there's a close relationship between the individual and the debtor. And the second is whether there's anything other than closeness to indicate that they were acting at something other than arm's length. Alitoso, I read our cases as basically saying, look, we've got to figure out whether this was an arm's length transaction or not. I don't see anything here to suggest that the law firm didn't really – I mean, they really did do the work, right? You're not disputing that. That's correct, Your Honor. I don't think there's any evidence that suggests that they didn't do the work. But I think when we look at the – the arm's length transaction, we're looking at a couple of things, both in the way that this – this sort of transaction unfolded and the relationship that they have with the other. I know. I mean, the way the money is dispersed is a little funny. I grant you that. Yes, Your Honor. But I guess I read the bankruptcy judge as saying, you know what, I know how these real estate lawyers operate, and this isn't that unusual. So I guess what I would want to hear from you is, was there some evidence that the way the money got dispersed in this weird fashion was atypical to the way the relationship had progressed up until the years before the bankruptcy? Well, I don't know if it's atypical next to the way that the firm generally treated the debtor. It's certainly atypical from the way that an attorney ordinarily would do it. I know. That's what I'm saying. It's funny. But if that's just the way these two folks worked things out, Mr. Warder and Mr. Williams, and that was the way the whole relationship was for eight years before, then we can't really say that there's anything nonarm's length about the way this thing happened in the last 90 days or so, right? No, Your Honor. I wouldn't agree with that. I think that you can. I think that the Court should look at what – what arm's length would be, looking at attorneys generally and the normative practice. As Your Honor noted, the court – the trial court did say that things can sometimes be funny with real estate developers, and the trial court judge mentioned that he had previously – that previously represented real estate developers. He nevertheless found that this was not arm's length. He nevertheless found that this was an insider transaction, in part because of the way that the money is going, but also, I think, in part because of some of the other factors. Looking at the closeness issue, I mean, this – the Warder and Unato firm was representing the – John Williams individually and all of these entities. They were – just the volume of business itself indicated how close they were, given that they were – they were doing hundreds of thousands of dollars. But that doesn't mean it's not arm's length. No, certainly, Your Honor. That's – that's one element to it. I think what the Court is looking at, the Court – the Court plausibly concluded on the basis of both the closeness of the relationship, kind of the funny things that happened with the money, the way that the Warder and Unato firm was involved with the – with the bankruptcy filing. As Mr. – Mr. Cook pointed out, Mr. – Mr. Cook mentioned that this is debtor's counsel. Mr. Warder testified, I think, that he's not typically debtor's counsel. He's ordinarily real estate counsel. He was doing this sort of a special favor for Bella Vista, which is outside of the arm's length. He – he testified that Bella Vista didn't even pay him for the bankruptcy services that he was providing. He wasn't normally a bankruptcy attorney. He was able to prepare the bankruptcy petitions off the basis of his own knowledge, the only – the only indication in the record that he had any kind of communication with the debtor. You want us to create a rule that – that forces the lawyer to say to the client, you know what, I really want to keep this money, so you better go get a different lawyer to handle the bankruptcy? Absolutely not, Your Honor. In fact, we're not arguing for a per se rule that attorneys are insiders in every instance. What we're saying here is that on the facts of this case, the trial court could plausibly have concluded that this attorney was an insider of this debtor based on all of the circumstances that are – that are going forth in this case, including the way that they're being paid, including the participation in the bankruptcy. And one important thing that – very important thing from a – from the standpoint of an – of an other unsecured creditor in this case is that Mr. – Mr. Unano testified – or Mr. Warda testified, essentially, that the trial court found that he was able to control the timing of the filing of the bankruptcy, which is not unusual typically for a debtor's attorney, except that in this case, Warda and Unano – the debtor was defunct. Warda and Unano was able to control the filing of its bankruptcy not to protect the debtor's interest, which the debtor had no – it was not continuing to operate. It had no – no income or anything like that. Warda and Unano was protecting its own interest. Based on the filing of the bankruptcy, Mr. – Mr. Warda was able to – to insulate the payment to his firm of $100,000, which was, again, four times as much as Mr. Unano owed Mr. – Mr. Warda from being – he was able to keep all of this money, whereas the other – the other creditors of the debtor who had – who didn't have the benefit of inside – of an inside relationship or this – this ability to influence or control got nothing. All of the debtor's money went to Warda and Unano because Warda and Unano was able to file – was able to direct the bankruptcy filing to preserve the payment to himself. That is, again, with – on the totality of the circumstances, with the closeness of the relationship, the fact that they were – you know, Warda and Unano, the – the Williams firms were Warda and Unano's by far their largest client, hundreds of thousands of dollars. The closeness of the relationship, the way that the money was being paid out here, I mean, it's certainly not typical for a – for a client to hand a check to their attorney and say, go ahead and take care of it, and not even have the client participate or even respond to the – the – I'm sorry, Your Honor, I'm out of time. If I can just briefly conclude that Mr. Warda was not paying discrete invoices. He wasn't – he couldn't even testify at trial as to what the money that he was taking out in round numbers reflected. There was no question that the money was owed, but it was certainly not arm's length. That's why I don't see how it adds up to $23,000-something-something and $0.17. Well, Your Honor, if I can address that point briefly with my time being up. There isn't a question as to what Bella Vista owed under the facts or the evidence that's been presented here. What you don't see in this case is when Warda's taking out $8,000 here and $9,000 here and $5,000 here, that it's related to a specific invoice or anything like that. There's – and that's not arm's length, Your Honor. Thank you, counsel. Thank you. The case to argue will be submitted.
judges: Reinhardt, Noonan, Watford